All right. I mean, I can't avoid saying, how do we get two Misty A's? Well, can I tell you, we also went to law school together, and we're in the same section. Oh, my goodness. I knew I should have stayed away from the question. All right. Ms. Hathaway-Cohen, you're up. May it please the Court. My name is Misty Hathaway-Cohen, and I have the honor and pleasure of representing Gilbert Herrera and Herrera Partners in my time before the Court. I'm here today after a long and winding road. We started in the bankruptcy court, and we moved up to appeal it to the district court, and now we're here before you. And this panel is well familiar with Warner and Warner's history, as well as what Warner stands for and what factors this Court and all courts in looking at professional fee applications are supposed to look at when determining whether or not those fees should, in fact, be paid or not. Today, we're going to look at Warner and whether or not Judge Bohm and the bankruptcy court in the Southern District applied it. Now, I will admit that when the fee application was originally submitted by my client, pro sax was, in fact, the standard. I will also admit that during the course of the six months of hearings on the fee application and the lengthy period afterward that this Court did issue its Warner opinion. I will also admit that Judge Bohm did give some credence to Warner, at least in name. It is appellant's position that it was in name only, because when this Court looks at the evidence in the record from six months of testimony, from seven days of lengthy testimony, that there is, in fact, evidence to warrant the compensation of at least some of Mr. Herrera's fees. Now, Mr. Herrera's work—actually, I want to take a step back. Mr. Herrera was retained— As it proceeds, given what you just said about pro sax, and I'm still grieving. Pro sax was my case that got overruled. I'm sorry. At any event, I'm getting over it slowly. My point is that you agree that the bankruptcy court and below considered it under pro sax and then under the later law. We don't have a legal dispute here in terms of, well, he wins on the one case, but he doesn't on the other. What's here? Is it, for the most part, a factual dispute? No, Your Honor. Or is it tied to the application of one of those statutes, one of those processes to these facts? Your Honor, it's appellant's position that it's the misapplication and or misunderstanding of Warner. Okay. And I will admit that I believe, at least when I checked last week, we're really the first case that's really tested Warner. That's probably why I have the pleasure of visiting with you today. But as this Court is aware, the Warner factors that we now look at is to determine whether or not a fee application should be paid, is whether or not there was a probability of success at the time the professional services were rendered. Second, whether the reasonable professional would have performed. Fourth, whether the services could have been performed by a trustee. And fifth, the potential benefit to the estate. And so those five factors were not really developed in the Court's opinion below. All right. Did the other side develop them? Did you develop them? We did not develop the Warner factors because they were not in place at that time. There is evidence to support each of those factors, Judge Owen. But I just don't understand how . . . What was that? Eight days worth of hearings here, right? Yes, Your Honor. It's just unfathomable to me, eight days on a hearing on fees. I mean, people try cases, you know, in eight days and less. People try trademark and patent cases in less than eight days. So I haven't read this full record, but it's hard for me to see, given the way I understand the case was postured. And I understand we may not be talking about eight to five on all eight days, but it's still eight days on a fee application. And so how can it be that within the record of eight days, under either one of these approaches, post-fax or Warner, the record isn't there? You found me one way or another. I mean, it's hard for me to fathom that the questions weren't asked on all these exhibits and so forth in eight days' worth of a hearing that under either one of these approaches, the post-fax or the Warner, but for the sake of it, that the record itself is somehow deficient on it. Your client testified extensively, was cross-examined and so forth on it. So what am I missing? Your Honor, that's probably the elephant in the room, I think, or the gorilla in the room, whatever cliche you choose. It's appellant's position that there is evidence in the record. But that's not the point. I mean, every five-factor in Warner is a fact issue. Yes, Your Honor. If they're competing facts on each element, it seems to me we don't have, we may have made a very different decision were we the bankruptcy judge or the district court, but we're not. So as long as there's some evidence on each of these factors to support what the district court and the bankruptcy judge did, how do we have jurisdiction? We don't get involved, it seems to me. Your Honor, it's appellant's position that the court needs to get involved because there is evidence of each of these factors. Well, tell us one of the factors where there's no evidence at all on the other side, that it was all one way and therefore the district court, and we've got to send this back. Okay. Because if there's evidence on both sides of all five factors, it seems to me we have to affirm. Well, Your Honor, there isn't evidence on the other side. There isn't contributing evidence regarding the probability of the success at the time my client prepared the or the communications with the purchasers, or the various efforts in the administration of the estate. There isn't anything controverting that, Your Honor. The only witness that controverted Mr. Herrera was Vess Hurley, who represented one, only one of the secured creditors. And in fact, in the briefing before the court, the majority of the briefing focuses on Hurley Enterprises. There's very little contesting to the DeShawn sale of the $27 million and Mr. Herrera's fees associated with that, or the general bankruptcy and investment banking advice that was given during the bankruptcy proceeding. Now, I will admit that there is substantial briefing about the detail-oriented nature of the briefing and whether or not there was sufficient detail. There is substantial argument regarding whether or not the billing was contemporaneous, and there is substantial briefing on the disclosure issue that we discussed at the briefing. But as far as controverting evidence, Judge Owen, of the probability of the success of those tasks, or whether or not those costs were reasonable, or whether or not the services were reasonable at the time they were performed, or whether they could have been performed by the trustee, there is no evidence against that. There is no evidence contesting that Mr. Herrera needed to prepare a confidential information memorandum. There is no evidence contesting that he needed to do due diligence to identify potential purchasers. There is no evidence contesting that he, in fact, did that. There is evidence contesting whether or not the secured creditor, Hurley Enterprises, was pleased with having to credit bid. But, Your Honor, that's the wrong focus. The focus should be on whether or not there was a reasonably likely benefit to the estate when Mr. Herrera completed that task. You said about the bankruptcy court's comment and from the briefs that your client did not furnish sufficient information and was to back up the time that he spent on these matters and that when he was asked, what does this mean, the court drew a blank from him. I mean, that was the inadequacy, aside from whether it was a benefit to the estate or not, as to what did he do. Your Honor, I recognize your concern, and I think the bankruptcy court did, in fact, point those issues out. Over the length of the six months of hearing testimony, my client was questioned repeatedly and duplicatively the same questions and the same line of testimony. And when posed with a specific billing entry from a year earlier, my client couldn't get the specific details of what that conversation was about or all the participants on that conversation. Did he have records of it? He had his billing records, absolutely, Your Honor. His billing records were very vague and inspecific. That's at least what we are told. The bankruptcy court did make a finding that they were vague and inspecific. However, the appropriate remedy for any kind of vague description issue is a reduction in potential fees, not a complete disallowance. And this Court has made very clear that the contemporaneous billing issue, which the bankruptcy court took very big complaint with, is not a basis for a complete disallowance of fees. Well, I mean, I thought, at least my impression was from the briefs that the bankruptcy court concluded from the vagueness and inspecificity of the billing records, he couldn't tell whether anything was done for the benefit of the State or not. I mean, he couldn't tell anything about this. He just kind of drew a blank, said, I can't tell one way or the other whether it benefited the State. Respectfully, Your Honor, my review of the record and my review of the bankruptcy court But, I mean, is that a conclusion the bankruptcy court said, essentially, what I referred to then? I mean, no disrespect, I don't read the record or the bankruptcy court's opinion as saying there's no evidence of anything. I think the bankruptcy court's opinion says it's difficult to discern because he lumped entries. It's difficult to discern because he didn't include the participants on the phone call. It's difficult to discern, you know, what this CIM was about, right? I think that's how I read the bankruptcy court's opinion. Now, Appleby will come here and tell you there's no evidence of anything, but as Judge Stewart pointed out, there's eight days of testimony about all that Mr. Herrera did. At the end of the day, is this a lesson learned? Is this a lesson on how an investment banker should probably take a good primer and how we attorneys are expected to bill? Yes. But does that lesson warrant a complete disallowance of $476,000? All right, so what value did he put? He said, okay, I get a lesser fee. How do you calculate the lesser fee and what evidence was there of what that lesser fee should be? I'm happy to direct the court specifically in the record, but in my reply brief on pages five and six, there are bullet points with specific sites of testimony evidencing what Mr. Herrera did by way of example. Research and initial information gathering process to gather information to market Hurley and DeShawn and to prepare the confidential information memoranda. There are four lines of references to the record to substantiate that task. Okay, we'll take this point. Assuming we would be persuaded the bankruptcy judge had a justification for finding this pretty vague, et cetera, et cetera, but your client probably was entitled to some fee, whatever that may be. Have you calculated or have a sense? I know what you just said about the reply brief. Is there a dollar amount that you have in mind that at a minimum he was entitled to here or what you want to do is go back and relitigate? What you say is already in the record. Well, Your Honor, let me answer that two ways. Number one, it'd be improper for me to give you my opinion because I can't substantiate it with the record, but what I can tell you is we already have to go back to the bankruptcy court because we already have a fee application pending for the post-confirmation fees. We have to go back already and deal with those fees that remain pending there. The problem I'm having is this case is about dollars and cents. It is. It's not about the law. I mean, now Warner is the law. I have a little struggle with an eight days worth of hearing. We have a very experienced, one of the best bankruptcy judges we have dealt with this patiently. We have an experienced trial judge who looked at this same record. We had three more judges. We're going to have five judges to deal with what basically is a dollars and cents proposition, which I'm not minimizing the importance, but to say that after eight days worth of hearing, having five judges look at two experienced bankruptcy judges, there's going to be another go around over the dollars and cents to figure this out. We're not going to be determining any law in the case. I mean, in this case, we're either going to determine, affirm, your client was a poor witness and the record didn't serve, so he got zeroed out, or there's some amount that he's entitled to, if not all of it, so somebody's got to go back and figure the dollars and cents. Trying to get a grasp on what is it the relief you really want to do over on this. I know you argued that the Warner factors weren't applied correctly, but is that your main argument you're making to us to convince us that when we review this record, we're going to conclude the Warner factors were improperly applied here, go back to that? Your Honor, my bottom of the ninth Game 7 of the World Series last pitch is that this court looks at Judge Bohm's opinion and finds that he didn't apply Warner properly, that in looking at more of a . . . I start with the proposition the appeal is from the judgment and not from any judge's opinion. We can affirm for any basis that the record allows, so while a judge has an opinion, the appeal is from the judgment. That is correct. That's why I stick with if there's eight days worth of record and the two have forced us to have it and the record is there, and I'm like, yeah, the bankruptcy judge said the Warner, Warner, Warner, Warner, you know, you may be out. You follow what I'm saying? I do follow what you're saying, Your Honor. However, if the bankruptcy court abused its discretion in coming to that judgment, in deriving that judgment, and in determining that judgment, then this court can reverse and remand. Take that and run. What's the abuse of discretion? The abuse of discretion is his failure to properly follow Warren in looking at whether or not the tasks that my client committed on behalf of the estate were reasonably likely to benefit the estate. And, Your Honors, I want to make it very clear, by all accounts, this was a successful bankruptcy. This was a plan that was adopted, and it was a plan that was confirmed, and it was a plan in a bankruptcy organization that resulted in 100 percent of the unsecured . . . Why was it so difficult for the bankruptcy court and others to make the attribution of your client's work to benefit of the estate? If it was as clear as you say it is, I mean, what were they missing? I want to make it very . . . I want to make this clear. I'm not saying that it was clear, Your Honor. What I'm saying is it was a very contentious litigation. The bankruptcy itself was very contentious. In fact, the contentiousness between the parties is what caused the bankruptcy to occur. And it's because of that contentiousness that it lasted as long as it did. And, Your Honor, what I'm saying is that when you look at what my client was hired to do with the rules . . . with the engagement letter, and when you look at what my client performed, he performed the services that were contemplated by the engagement letter. And there's evidence to support that, as referenced at the briefing at pages 5 and 6. And the bankruptcy court did not look at those tasks and ask and examine and evaluate whether those tasks, when they were rendered, were reasonably likely to benefit the estate. The court operated from a position of sympathy for the secured creditors and from a position of looking at whether or not Mr. . . . Finish the sentence. Thank you. No commas, no semicolons. Okay. The bankruptcy court operated from a position of a results-oriented position. And it's because of that that we're asking the court to look at whether or not Warner was, in fact, properly applied and reverse and remand so that we can get all of the fees properly determined under Warner. All right. Thank you. Reserve your rebuttal time. Yes, Your Honor. All right. Thank you. All right. Let's hear from Ms. Segura. So what are we missing here? You're saying this man did all this work and he wasn't owed anything? I mean, as I said, it's a dollars and cents case. I mean, there's a lot going on here. We see cases go away, settle, figure out the money, instead of still running the clock, the meter, if you will. You know, on a bankruptcy case, with all this going on, eight-day hearing, five judges hearing, I mean, is this about a difference in principle, P-R-I-N-C-I-P-L-E, or is it about the money, or what? Your Honor, that's a great question. That's what I'm trying to . . . There were eight days of hearing, and that's why this case is so amazing, that the appellants could still not meet their burden to articulate and prove to the witnesses that he rendered and how the services . . . Well, he did . . . certain things were produced. I can't . . . the settlement reports, he did generate a list of prospective purchasers, some due diligence was done. I mean, there was some work that's directly, it seems to me, reasonable at the time, attributable for the benefit of the bankruptcy estate, or is that just not right? Your Honor, he did testify that he prepared a critical information, a confidential information memorandum. He talked about how critical it was. However, he never introduced this core critical work product into evidence. So, the bankruptcy court had nothing to look at to see what actually he did, how much work went into it. The contacts list was actually brought into evidence later in the case to try to see who he actually contacted, because his billing records were so vague. So, that's why that piece of evidence was introduced. So, yes, the appellant did go through what we like to call . . . So, was that a benefit or not? It was not a benefit in this situation, Your Honor. Buckhorn was a company that purchased addition disposal at the auction, and it ended up purchasing at auction for $27 million. However, Buckhorn, before the bankruptcy even started, had offered the additions $30 million to buy their company. This is a $3 million net loss after we've gone through this whole bankruptcy experience. So, under that situation, it was not of a benefit. Hurley, the sale of Hurley . . . Well, I've heard some evidence that at the time they thought it might be worth as much as $70 million. Yes. And that other stuff happened, and so looking at it prospectively, there was a reason to believe that there might be purchases out there willing to pay more than Buckhorn. Well, that was, I believe, proper testimony by appellants at the application to employ. He actually, I believe, through a proffer, testified that he thought Hurley would sell within four months, and he thought it would be valued at $50 to $55 million. And we know in the actual result, because of Mr. Herrera's, the appellant's, lack of effort and actually harmful actions on the sale process, Hurley was sold without an auction to my client for a credit bid of $14 million, and he actually had to use money that he borrowed to get his company back. Now, the sale addition, he had anticipated it might go for $30 million, and it would take longer to sell, but the results were actually flipped. So in this case, Mr. Herrera could not only prove what actual services he provided, he didn't also show that they were reasonably likely to benefit the estate at the time rendered. The bankruptcy court did an extraordinary thing in this situation. Even though this court's decision in Warner had not yet been decided, Judge Bohm knew that this court was considering that standard in Bunk, so he considered it and he applied it prospectively in advance. So our position is, to answer Judge Stewart's question, this is a factual dispute, eight days of hearing. Mr. Herrera had very little direct examination to prove up his fees. The rest of the cross-examination were questions trying to figure out what he was doing. And the reason it was so prolonged, as Judge Bohm mentioned, Mr. Herrera was very evasive, answering straightforward questions. He would often hedge his answers, and he could not articulate why he did certain things or provide more detail. So the bankruptcy court made a credibility finding based upon many days of testimony, and our position is that, as the trial court, he had the ability to listen to the appellant's testimony and judge that credibility. And so we'd say this is a fact situation, not an improper application of the law. Also, regarding one of the questions asked by this court, I believe it was Judge Owen, you asked how do you calculate a lesser fee. Well, the only way that the court can calculate a lesser fee or this court is by venturing guesses and actually for the court to undertake an extensive investigation as to the fees and the services that were performed, which this court's decision in in re evangeline requires that the court not do. Also, I'd like to address a misstatement by the appellant that indicated there's actually a fee application pending before the bankruptcy court for post-confirmation fees. There actually is no fee application pending for post-confirmation fees. We expect that the appellants may file a fee application, but I just wanted to let the court know there is no fee application pending at this moment for post-confirmation fees. Also, Judge Stewart, you had indicated that this case is about dollars and cents, and how much does the appellant want? Do they want a do-over at the trial court? We believe that a do-over at the trial court would not produce any different situation for the appellants as has already been received. I believe this court's opinion in Sims dictates that if a man's not going to produce a different result, then there's really nothing for this court to do, and that's our position, Your Honors. Well, come back to the point you said that the plaintiff did not render there was some core piece of critical evidence or something that he didn't introduce. Yes, Your Honor. It was called, I believe, a confidential information memorandum, and Mr. Herrera testified that this was a core work product that he based all of his marketing efforts on. It's basically, it's my understanding, is kind of like a marketing brochure that talks about the companies and provides information to prospective purchasers, like marketing materials. And he testified how critical it was, how important it was, yet he didn't list it on his exhibit list. He never introduced it into evidence. So Judge Bohm addressed this in his opinion. He's like, I don't even know what this is because the fee applicant, and under Evangeline, the fee applicant bears the burden of proving his fees, has not produced proof of his work product. Back to what Judge Stewart has emphasized is the length of the hearing on a fee application, and apparently the successful conclusion of the bankruptcy estate, and yet the result is he did nothing. I mean, that seems like it took eight days to make that conclusion, especially against the result of success. It sounds like somewhere in there the bankruptcy judge may have made a mistake. Well, Judge Jolly, Judge Bohm did recognize that the case was relatively a success. However, he also recognized that it was not a success because of the appellant's efforts. The success of the bankruptcy case had a lot to do with the secured creditors, who were the Applees. Each of my clients were owed $30 million on secured notes. Those notes were secured by the stock of each subsidiary, Dishon Disposal and Hurley Enterprises, and they actually relinquished part of their secured claims so that unsecured creditors would get paid in full via a joint plan, and that was a term that was negotiated with the debtors so that unsecured creditors would get paid. So that's how the case was a success for unsecured creditors. What was Mr. Herrera supposed to do? What was he hired to do that he did not do specifically? He was hired to market and sell the Dishon Disposal and Hurley Enterprises subsidiaries so that the secured creditor notes could get paid in full. Did that happen? That did not happen, Your Honor. The secured creditor notes did not get paid in full. My client, the Hurleys, had to actually credit bid to get their company back. One of them. I thought one of them was successful, the first auction was successful. The first auction, because Terry Dishon, my client, a secured creditor, he actually credit bid as a qualified bidder to drive up Buckhorn, to drive up the price. Buckhorn actually started the bidding at $12 million. If Terry Dishon had not credit bid, Dishon Disposal would have sold for $12 million at auction. Mr. Dishon exercised his credit bid, and then Buckhorn came back and bid the $27 million, and that's where the auction ended. Are you essentially saying that the bankruptcy judge viewed the benefit to the estate retrospectively instead of making the judgment at the time that the decision to engage in this conduct was made? I'm not saying that, Your Honor. He looked at it prospectively, and he devotes 10 pages of his opinion showing how he looked at it in a prospective approach. However, he also said, and I think, Judge Jolly, you recognize this in your concurring opinion in Werner, that basically results still matter. It still matters the results that you obtain from your services, and it also still matters how a professional does his job. Judge Boehm was mindful that it appealed that the appellants just wanted to be paid for just simply being there, and it matters how you do your job and what the results are. It's not, you know, the determining factor. Do you have any indication of how many hours Mr. Herrera spent in trying to achieve the tasks that were assigned to him? I have read in the appellant's brief they've calculated that amount, I believe it 1,400 hours between Mr. Herrera and Mr. Bigger's staff who worked for Mr. Herrera. Well, I mean, do you challenge that number of hours? It's hard to know whether to challenge the number of hours because Mr. Herrera's testimony and his time entries were so vague, lacking detail, and they lumped many tasks, Your Honor. I'm not saying that he was dishonest. However, there was a definite question with the bankruptcy court about whether these time entries were accurate. Is an investment banker's fees determined on the same basis of an attorney's fees, that is, on an hourly basis? In this case, Your Honor, yes. Mr. Herrera was working on an hourly basis. He was not working for a percentage other than if the company sold for, I think, more than $30 million, he could receive a percentage after that. But that situation didn't occur, so he was just working on an hourly basis. I mean, intuitively, he was never fired from doing the job, and so precision of the records there may be intuitively still seems being zeroed out is sort of a—well, I don't know. If you're hired on a contingency and you don't achieve, of course, you get no fee. But intuitively, it's a little hard to see, even with the paucity and so forth, that unless, I guess, you're arguing nothing he did from engagement would be attributed to success so that he would be entitled to any amount of fee at all. Is that what the state of the record—I mean, I guess that's the bottom line. Is that the bottom line of the argument? That's the bottom line, Your Honor. We believe that— I mean, even in a case in a different context where there's a pleading and there's some determination of an award but can't figure it out. So somebody gets nominal damages. I mean, it's amorphous, but it's a recognition of some amount owed. So the zero—I mean, and perhaps that's what eight days, as Judge Charlie says, gets, eight days of hearing and going through, zeroed out. But as I said, intuitively, and as he asked, what did he not specifically do? And you're holding fast to the zero sum is what he was entitled. Is that right? That's right, Your Honor, and I agree. Fourteen hundred hours, he did nothing that benefited the estate. Our position is he went through the motions. What he did did not benefit the estate from this perspective. At the time he was doing the services, for instance, he said he contacted— one of the buyers, Buckhorn, he—I think the record reflects that he— and they ended up getting in a yelling argument, could have driven Buckhorn away from the table. So he provided services. However, he did not prove that they were reasonably likely to benefit the estate at the time they were performed, and it was his burden to meet, and he woefully fell to meet that burden. To what extent does the bankruptcy's denial of fees in their entirety represent his failure to disclose his previous relationship fully with the attorney for the bankrupt and failure to give benefit to the estate? I mean, is it just 100% on one and 100% on the other, just complete alternative rulings? Is that what it is? They have no symbiotic relationship? The bankruptcy court expressed in its opinion that the 2014 disclosure issue was not the sole basis for denial of Mr. Herrera's fees. He said if that were the only defect, then he would not resort to such an extreme remedy. However, in the totality of the circumstances, which was the failure to prove up his fees, the lumping, the vague time entries, the lack of detail, the non-contemporaneous billing, also the failure to show his services were reasonably likely to benefit the estate at the time performed, that the totality of those circumstances and, in addition, the 2014 disclosure merited the entirety of the fees being denied. In this case, is there any possibility that this could go through some sort of mediation process to find a middle ground? This is outside the record, Your Honor, but to answer your question, there have been discussions in the past. However, they have not been perfect. Have you gone through the court's process? No, Your Honor. Judge Bohm does not favor mediation, and the parties engaged in informal discussions. What about the Fifth Circuit's process? I don't know if my clients would be agreeable to that at this juncture because of how far this has been taken. All right. Well, let me ask you—well, never mind. I'm still stuck in terms of the trial process going on. I mean, there's bankruptcy in that trial, but ordinarily there's a pretrial order. There's a listing of the exhibits, et cetera, et cetera, and I'm sort of stuck back on this document, this marketing piece and all that. I take it, assuming that kind of a process, that document or something akin was never listed in a pretrial order, et cetera, et cetera, so it was not in any way part. We're not dealing with a ruling of the district court disallowing it and any of that. It's whatever was on the order, that's the evidence put in. Is that a fair way we should understand it? That's a fair way to say it, Judge Stewart. The parties are required by the local rules to file their exhibit and witness list, usually within two or three days before the hearing. That was done. Mr. Herrera only listed pleadings, his fee application, exhibits to his fee application, which were his time entries, the notice where he served his time entry, and the certificate of service. He listed nothing else. He also listed witnesses that he intended to call, himself, debtors' counsel, Mr. Bigger's staff. He didn't call any of those witnesses. He only himself testified. And not only is this a case, Your Honor, of stuff being excluded by the district court, the district court actually allowed everything in the record into evidence. My clients filed a motion to strike under Rule 8009E to only have certain items listed in the record and challenge some of the record designations by the appellants. However, the district court decided, no, he was going to let everything in. So the entire record of the bankruptcy court, all the pleadings, all the transcripts, everything has been made a part of this record. Well, it seems like, at least at the time that this fee agreement was reentered into, everybody thought that his services would benefit the estate. I mean, you can't say that there was no hope for it or anything like that. It seems like certainly there was some benefit at some point to the estate. I mean, zero is sort of a harsh outcome. It is harsh, Your Honor. However, the circumstances and the facts and the failure that he did not meet his burden and the actual outcome, which still matters under Warner, necessitate the denial of all of his fees. At the time that he was employed, yes, everyone was very hopeful that the companies would be sold, especially for the amounts that were being testified to. Yes, but there was also evidence there was a lot of litigation that drained a lot of value from the company over the course of the bankruptcy. There was litigation pending, Your Honor. However, all that litigation was resolved in January of 2014, and the companies— But at a great cost, right? Hundreds of thousands of dollars a month? Right. Or hundreds of thousands of dollars? The secure creditors paid to settle that litigation, Your Honor. So my clients, out of their own pocket, paid for that litigation to be settled. Did they pay for the costs, the litigation costs that were accruing during the bankruptcy? The debtor, as the parent company of subsidiaries, would call up money from the subsidiaries. So the subsidiaries were the only companies making money during this whole process, which the subsidiaries were operated by my client as their former companies that they were never paid for. So the actual debtor did not pay that. It was my client's companies that paid for all costs and expenses. Okay. All right. Thank you. Thank you, Your Honor. I have a few points I would like to bring to the Court's attention. First off, while the fee application is not in the record, the fees, the invoices for the post-confirmation fees remain on the record, and this Court can take judicial notice of pleadings that were filed in the bankruptcy court, and they are there. They remain all post-confirmation expenses, as this fee application only addressed pre-confirmation expenses. It can't be both ways, but anyway. Okay. I mean, it can't be both ways. She says it's not pending, and we'll look at it. Go ahead. Make your other points. Second, Your Honor, Judge Owen, you were visiting with my opposing counsel about whether or not Mr. Herrera's confidential information memorandum that he prepared for Hurley and Deshaun was a benefit or not. And while I think that that is an important question, the test for whether or not that confidential information memorandum should be compensated is when he prepared it, was it reasonably likely to provide a benefit? And is it in evidence? The confidential information memorandum is not. Why not? Why not? That is the million-dollar question. Why not? Why not? What I will tell you is what's in the record, and the bankruptcy court even identified it in its opinion. There is a spreadsheet listing the acquisition candidates for Deshaun. Respond to the question, why is it not in the record if it represents the quality of what he might or might not be owed as compensation? I mean, if the answer is a privileged one and so forth, just say that, you know, but. My answer is one that is something I don't like to do often, which is to malign trial counsel. My job as an appellate attorney. Someone else tried the case. Yes, Your Honor. Got it, got it. Okay, all right, so that was, all right, I got it. And that time. You downed it on appeal. I was laboring under the assumption that you had handled this from the beginning. No, Your Honor. All right. And that also leads me to the second point, which is my client's trial counsel did elicit a direct examination that was very short. He was shut down repeatedly by Judge Baum. He was leading questions and leading the witness, and the judge warned him on the record. It's in the record. You probably saw it, Judge Stewart, when you saw it, when you read the record, and warned trial counsel that if you don't stop leading, I'm going to not allow you to ask questions. And like a wilted flower, trial counsel shut down. All right, but counsel often says the trial judge, they wanted to keep things out. The trial judge, bankruptcy judge, essentially led everything. That's different. You got it, Judge Owen. I know where you're going with this. That was a second appeal. So when we designated the record as the appellant, and this was me, designated the record for what I wanted the district court and ultimately this court to review, I designated the items that I thought the court needed for a complete record of the posture of the case and the context of the case. Opposing counsel filed a motion to strike, I think like 80 items. Don't hold me to that. But a substantial number of the items that I designated, and I see I'm over. May I please answer this question? Judge Baum, we had briefing on the issue, and Judge Baum granted their motion to strike, limiting my appellate record to 20 or 30 items. We then appealed that to Judge Ellison, and Judge Ellison looked at it and saw how in the appellate, in the judge's opinion, a bankruptcy judge opinion, he clearly looked at items that were not admitted into the record. He looked at the application to employ. He looked at a spreadsheet of candidates for acquisition. He looked at a spreadsheet, actually a list of initial letters sent to acquisition candidates, the nondisclosure and confidentiality agreements. He looked at all of these items that weren't formally admitted, and so that is what Judge Ellison allowed in the appellate record. That was not Judge Baum. Judge Baum excluded that from the appellate record, and Judge Baum was going to limit the appeal to what was specifically admitted into the court's record during the hearing. The rest of your argument is not based on factual disputes, but it's your argument. You said to me you're hanging your hat on that the bankruptcy court and trial court misapplied the Warner factors to the facts that we have and the record that we have. Is that correct? Yes, Your Honor. It's appellant's position that the court below didn't evaluate or examine the Warner factors with the evidence in the record. We don't have an issue in the briefing or otherwise that your client was disallowed through his direct testimony or otherwise from putting forth evidence which would support his claim for the fees, correct? I want to make certain I understand what you're saying, so I can answer. I'm trying to say we don't have evidentiary issues. No, Your Honor. Vis-a-vis my client didn't get the money because he wasn't allowed to put in this spreadsheet, his accountant wasn't allowed to testify, etc. We don't have those issues here, right? That is correct. Your Honor, this is not an evidentiary point of error. This is an abusive discretion for failure to apply Warner. All right, so from your standpoint, when we view this case, we're basically looking at it in that context that if we conclude that the bankruptcy court properly applied the Warner factors, you acknowledge you lose on appeal. Your Honor, if this court finds that the bankruptcy court did look at Warner and did look at the evidence in the record, even with a finding that he was less than credible, not incredible, but less than credible, he gave some weight, not zero weight, he gave some weight to the eight days of testimony. And if this court finds that through that eight days of testimony, even giving some weight, that the bankruptcy court did in fact look at whether or not those services were reasonably likely to benefit the estate, they were reasonably charged, they were the right services, and then you find that the bankruptcy court did all of that, then I lose. All right. Was there one last question? Yeah, yeah, yeah. It seemed to me there was evidence that he went back and changed the billing entries and to add time that he'd spent reviewing the billing and that was there ever an opportunity for him to go back and say, well, take out all the stuff that you added in, come up with a clean set of billing entries. Did he ever say, let me get an opportunity to redo my billing and resubmit it? Did he ever ask for that and was denied that opportunity? Your question brings up two points. May I answer those two points? The first one, he did in fact file an amended final fee application that converted the original fees from quarter hour to .1. And that amended fee app resulted in, I believe it was like a $4,700 reduction in fees. That doesn't address my point. I thought the court found that he added stuff into time records that he didn't actually perform at the time. So my reading of Judge Bowen's opinion is that the changing of the initial final fee app to the amended final fee app gave less credibility to the veracity. That's how I read it, Your Honor. And when you look at my opening brief on pages 16 through 17, I went by month by month of the invoices and show what the interim fee app was. So the first short period of time, the final. Okay. Other than what was submitted that Judge Bowen was not satisfied with. After that, did he ask for the opportunity to go back and redo the bills to take care of the objections that Judge Bowen found? So after Judge Bowen, after the opinion came out, did he go, did my client go back and say, can I please get another chance? Or during the hearing or at any point? No. We weren't aware of what Judge Bowen's objections were during the hearing, right, during the six months of the testimony. We weren't aware of what Judge Bowen's position was. Now, did my client, in response to the sometimes badgering, difficult line of cross-examination, say, hey, just let me redo it? No, he did not, Your Honor. Now, one last thing, please, because you did bring up appellate mediation. We, this is not in the record, but we have. This is not going to go to the merits. I was just curious if there was hope that this might be resolved short of zero and, you know, remand or what. And I would just like to reflect that we have, as appellants, sought mediation for all of the fees, for those that were post-confirmation and pre-confirmation, and it has repeatedly been refused. And so while that is something that we have sought to try to avoid our fees, it has been refused. And it's appellants' position that it's been refused because secure creditors have a vested interest in contesting this because of the $4 million carve-out that pays for all of the fees for debtors' counsel and all the professionals in this case. Thank you, Your Honors. All right. Thank you to both counsel. The case will be submitted before we take up the fourth.